# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

### CASE NO.: 8:23-CV-01974

SHELENE SMITH, as
Guardian for MATTHEW
JOSEPH SMITH, an
Incapacitated person,

      Plaintiff,

vs.

NEUROINTERNATIONAL
HEALTHCARE, LLC d/b/a
NEURORESTORATIVE
FLORIDA, a limited liability
Company, CENTER FOR
COMPREHENSIVE SERVICES,
INC., d/b/a
SEVITA, a corporation,
NATIONAL MENTOR
HOLDINGS, INC, a
Corporation, and TAYLOR
MITCHELL, an individual,

      Defendants.

_____/

## SECOND AMENDED COMPLAINT

    **COMES NOW** the Plaintiff, SHELENE SMITH, as Guardian for

MATTHEW JOSEPH SMITH, an incapacitated person, by and through her

undersigned counsel, and brings this action against the Defendant,

1

NEUROINTERNATIONAL HEALTHCARE, LLC, d/b/a NEURO RESTORATIVE, a limited liability company, and alleges as follows:

1.     This is a civil action for damages for which the Court has diversity jurisdiction in accordance with 28 U.S.C. §1332 because the amount in controversy exceeds the sum of Seventy-Five Thousand and One Dollars ($75,001.00), exclusive of costs, interest and attorneys' fees, and the action is between citizens of different states.

2.     Plaintiff, SHELENE SMITH ("SHELENE SMITH"), is an adult resident of Darlington, Darlington County, South Carolina, and is the duly appointed, qualified and acting guardian of the person and property of MATTHEW JOSEPH SMITH, an incapacitated person.

3.     At all times material hereto, MATTHEW JOSEPH SMITH (hereinafter "MATTHEW SMITH"), was a resident of Sarasota County, Florida, and a resident of Neuro Restorative's assisted living facilities, including Mango Place (hereinafter "MANGO PLACE") located at 7193 Proctor Road, Sarasota, Sarasota County, Florida.

4.     At all times material hereto, MATTHEW SMITH is a veteran of the United States Army, having served in Iraq in 2004 and 2005, and he is eligible for treatment and care through the Veterans Administration of the United States Department of Veterans Affairs.

2

5.    SHELENE SMITH certifies that all statutory conditions precedent to the commencement of all claims made pursuant to *Fla. Stat. §429.293*, including the completion of a presuit investigation to corroborate the validity of Plaintiff's claims, the mailing of a Notice of Intent to Initiate Litigation letter by certified mail return receipt requested, which included notifying the prospective defendants of the asserted violations of MATTHEW SMITH's statutory resident's bill of rights provided in *Fla. Stat. §429.28* or deviations from the standard of care, and observance of the seventy-five (75) day investigatory period after mailing of the Notice of Intent before filing this lawsuit.

6.    At all times material hereto, Defendant, NEUROINTERNATIONAL HEALTHCARE, LLC, d/b/a NEURO RESTORATIVE (hereinafter "NEURO RESTORATIVE"), was and is a foreign limited liability company with a principal business address of 313 Congress Street, 5th Floor, Boston, Massachusetts 02210, and was authorized to do business and was doing business in Sarasota County, Florida.

7.    At all times material hereto, NEURO RESTORATIVE, owned, operated, managed, or maintained assisted living facilities licensed by the State of Florida under Chapter 429, Florida Statutes, including MANGO PLACE located at 7193 Proctor Road, Sarasota, Sarasota County, Florida.

8.     In accordance with Fla. Stat. §48.193(1), the Court has specific jurisdiction over Defendant, NEURO RESTORATIVE, because this action arises from the following enumerated acts by NEURO RESTORATIVE:

   a. Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state; and

   b. Committing a tortious act within this state.

9.     Defendant, NEURO RESTORATIVE, has derived substantial revenue from interstate commerce, including the State of Florida, and could reasonably expect its business activities to have consequences in Florida.

10.     At all times material hereto, Defendant, NEURO RESTORATIVE, controlled or had the ability to control:

   a. the budget at its assisted living facilities;

   b. the staffing levels at its assisted living facilities;

   c. the hiring and firing of employees and staff at its assisted living facilities; and

   d. the creation and enforcement of policies, procedures and guidelines at its assisted living facilities.

4

## **ALLEGATIONS OF FACT**

### A. **MATTHEW SMITH needed intensive neurobehavioral residential treatment for his traumatic brain injury, which was paid for by the Veterans Administration**

11.    In 2004 and 2005, MATTHEW SMITH served as a Sergeant in the United States Army and did two tours of duty in Iraq.

12.    Having witnessed the horrors of war, including improvised explosive device detonations that resulted in the deaths of his fellow soldiers, as well as women and children, MATTHEW SMITH returned to the United States and was diagnosed with Post-Traumatic Stress Disorder (PTSD).

13.    On March 19, 2006, MATTHEW SMITH was in a catastrophic motorcycle crash that resulted in a traumatic brain injury (TBI) that rendered him incapacitated, severely compromised in terms of cognition and behavior, and, for a time, wheelchair dependent.

14.    Subsequently, the VA determined that MATTHEW SMITH's TBI from the crash was a "service-connected disability" because it was the result of his PTSD from serving in Iraq, which made treatment and care for his TBI available through the VA.

15.    At all times material hereto, NEURO RESTORATIVE was contracted with the Veterans Administration ("VA") through a Veterans Care Agreement

("VCA") in which the VA paid for services at NEURO RESTORATIVE for veterans, like MATTHEW SMITH.

16.    At all times material hereto, NEURO RESTORATIVE had applied to the VA for a VCA, which was approved based upon representations that NEURO RESTORATIVE could safely and competently provide professional rehabilitation services for veterans with TBI, such as MATTHEW SMITH.

17.    At all times material hereto, NEURO RESTORATIVE was "VCA approved," meaning that the VA would approve veterans on an individualized basis for residential TBI rehabilitation and services at NEURO RESTORATIVE and pay substantial amounts of money per month to NEURO RESTORATIVE for providing these services to veterans like MATTHEW SMITH.

18.    On September 25, 2018, the VA approved MATTHEW SMITH for intensive neurobehavioral treatment and services for his TBI at NEURO RESTORATIVE's Siesta Key program pursuant to a VCA. A copy of the correspondence from NEURO RESTORATIVE to Plaintiff dated September 25, 2018, is attached and incorporated herein as **Exhibit "A**."

19.    At all times material hereto, MATTHEW SMITH was a third-party beneficiary of the VCA between the VA and NEURO RESTORATIVE and the Resident Contract between Shelene Smith and NEURO RESTORATIVE.

**B. Neuro Restorative assumed a duty to provide the highest standard of care to Matthew Smith by representing to his legal guardian, Shelene Smith, prior to Matthew Smith's admission to Neuro Restorative that Neuro Restorative had a fully trained and qualified staff available to safely supervise Matthew Smith at Neuro Restorative.**

20.    Following the VA's approval of MATTHEW SMITH's admission to NEURO RESTORATIVE for intensive neurobehavioral rehabilitation services, NEURO RESTORATIVE touted its "fully trained and qualified staff" and "world-class assisted living program for people with neurological impairments" to Plaintiff in a written welcome packet. True and correct copies of Neurorestorative's "welcome" correspondence and single-page marketing pamphlet are attached and incorporated herein as **Composite Exhibit "B**."

21.    Prior to MATTHEW SMITH's admission to the assisted living facility, NEURO RESTORATIVE, by and through its employees, agents, and staff, screened for suitability of residency and represented to Shelene Smith that he met NEURO RESTORATIVE's selective requirements.

22.    In September 2020, NEURO RESTORATIVE requested from Shelene Smith a copy of MATTHEW SMITH's current Plan of Care and Instructions of Care that detailed proven strategies for supervising MATTHEW SMITH and dealing with the sequela of his TBI, including his severe neurological, cognitive, and behavioral impairments that made him at times difficult to manage. A copy of MATTHEW

SMITH's Plan of Care and Instructions of Care is attached and incorporated herein as **Exhibit "C**."

23.    The Instructions of Care provided the strategy for interacting with MATTHEW SMITH and specifically stated, in relevant part:

1) Daily greetings should be done with a positive, enthusiastic attitude. This promotes positive energy, which helps Matt to have a positive attitude. Please do not display tiredness, non-enthusiastic or negativity (sic) attitude. Do not speak to him in a degrading manner, this has happened in the past (sic). Encourage positive and good attitude (sic) daily. Guide and re-direct for appropriate behavior and attitude.

2) Let Matt try to process things through, in his own mind, on his own, before re-directing him in what he needs to do. Do not rush his thinking, let him finish. Do not <u>tell</u> him what needs to be done next, ask him what he thinks needs to be done next, this helps him to process in his own mind, which promotes memory recollection, which his (sic) better for healing.

*Id*.

24.    Near the end of September 2020 and prior to MATTHEW SMITH's admission to NEURO RESTORATIVE on October 2, 2020, Shelene Smith attended an orientation at NEURO RESTORATIVE, where she discussed the Plan of Care and Instructions of Care with NEURO RESTORATIVE's then program director, Dr. Pritesh Parbhoo.

25.    Plaintiff, Shelene Smith, asked Dr. Parbhoo whether NEURO RESTORATIVE's staff were trained, qualified, and capable of following the recommendations therein, and Dr. Parbhoo answered in the affirmative.

26.    Dr. Parbhoo assured Plaintiff, Shelene Smith, that MATTHEW SMITH was in good hands because NEURO RESTORATIVE had exceptional staff with vast experience in supervising residents with TBI like MATTHEW SMITH.

27.    Plaintiff relied upon Dr. Parbhoo's assurances and the written representations contained in the packet of NEURO RESTORATIVE's welcome materials (**Composite Exhibit "B"**), and she signed NEURO RESTORATIVE's consent to treatment forms and the Resident Contract. Unsigned copies of the consent to treatment forms and the Resident Contract are attached and incorporated herein as **Exhibits "D" and "E"**, respectively, and signed copies of same are in the possession of NEURO RESTORATIVE and have been requested in discovery but not yet produced.

28.    In providing NEURO RESTORATIVE with informed consent to provide intensive neurobehavioral residential treatment for MATTHEW SMITH and his TBI, Plaintiff had reasonably been led to believe by NEURO RESTORATIVE that her son, MATTHEW SMITH, would be receiving world-class neurobehavioral rehabilitation and care from NEURO RESTORATIVE's most qualified and experienced staff.

29.    NEURO RESTORATIVE, by and through its employees and agents, assumed a heightened duty of care to MATTHEW SMITH prior to his admission on October 2, 2020, by representing to Shelene Smith, in her capacity as MATTHEW

SMITH'S guardian, that MATTHEW SMITH was in the good hands of NEURO RESTORATIVE's exceptionally trained staff with vast experience in supervising residents like MATTHEW SMITH.

30.    At all times material hereto, NEURO RESTORATIVE acted by and through its employees and agents, whose undertakings were for the benefit of NEURO RESTORATIVE.

31.    At all times material hereto, NEURO RESTORATIVE, as the employer and principal of the employees and agents who supervised or managed MATTHEW SMITH during his residency at NEURO RESTORATIVE, was and is vicarious liability for the acts of abuse, neglect, and negligence of those same employees and agents, who were, at all times, acting for the benefit of NEURO RESTORATIVE.

C. **Unbeknownst to Plaintiff, Neuro Restorative had an unwritten corporate policy to forego the hiring of brain injury certified employees and had recently lowered the employee eligibility requirements even further prior to Matthew Smith's admission on October 2, 2020**.

32.    At all times material hereto, NEURO RESTORATIVE had an unwritten company-wide policy to forego the hiring of Certified Brain Injury Specialists ("CBIS").

33.    CBIS undergo intensive training and receive certification that delves into the essential aspects of brain injury treatment needed to effectively care for patients. CBIS certification training includes:

a)  guidelines for interacting with TBI patients and building rapport;

b) education in brain injury and behavior;

c) medical complications and safe medication management; and

d) helping families cope with brain injury.

34.    In order to become a CBIS, the applicant must have 500 hours of direct work with TBI patients and ample experience in the core disciplines of behavior, speech, cognitive challenges, physical therapy, and community reintegration.

35.    Certification is valid for three years, requiring CBIS to renew their status and stay current with treatment issues and protocols in the process every three years.

36.    The costs associated with becoming a CBIS are both time-consuming and expensive.

37.    At all material times hereto, NEURO RESTORATIVE had an unwritten company-wide policy to hire young individuals, primarily with high school diplomas only and absolutely no prior job or life experience working with TBI individuals, to serve as "direct support professionals" known as "life skills coaches" or "life skills trainers" and work directly with TBI clients, such as MATTHEW SMITH.

38.    At all material times hereto, NEURO RESTORATIVE's unwritten company-wide policy to forego the hiring of highly qualified and trained CBIS

existed to decrease company payroll expenses and increase corporate profits through the use of inexpensive, inexperienced, and unqualified labor.

39.    At all material times hereto, NEURO RESTORATIVE's unwritten company-wide policy to forego the hiring of highly qualified and trained CBIS made it easier and less expensive to comply with the minimum staffing ratios, set forth by Rule 59A-36.010(3) of the Florida Administrative Code.

40.    In turn, and at all times material hereto, NEURO RESTORATIVE tried to keep its assisted living facilities at or near maximum capacity, which resulted in greater profits to NEURO RESTORATIVE at the expense of the health and safety of its residents, like MATTHEW SMITH, who were subjected to supervision by inexpensive, inexperienced, unqualified, and expendable individuals who were not CBIS.

41.    NEURO RESTORATIVE's unwritten hiring policy represented a breach of the heightened duty of care that NEURO RESTORATIVE had assumed prior to MATTHEW SMITH's admission, when NEURO RESTORATIVE represented to Shelene Smith that her son would be supervised at NEURO RESTORATIVE by exceptionally trained staff with vast experience in dealing with TBI clients.

42.    On January 28, 2020, approximately nine (9) months prior to MATTHEW SMITH's admission to NEURO RESTORATIVE, there was a

corporate merger between NEURO RESTORATIVE, which had already approved MATTHEW SMITH for residency back on September 25, 2018, and an entity that did business as "The Mentor Network."

43.    The merger between the NEURO RESTORATIVE entity that had approved MATTHEW SMITH for residency in September 2018 and the entity that did business as "The Mentor Network" resulted in a new "doing business as" name for Defendant, NeuroInternational Healthcare, Inc.: NeuroRestorative Florida.

44.    Prior to the January 28, 2020, corporate merger, the minimum eligibility requirements and essential functions for employment as a "life skills coach" at NEURO RESTORATIVE fell well short of those for a CBIS, but they at least included the following standards:

- Must have compassion for and desire to work with Clients with traumatic brain injuries;
- Must be of good moral character and emotionally stable;
- Serve as a mentor and companion to Client; and
- Being an encourager for Client to achieve their rehab, cognitive and program goals.

Pursuant to Local Rule 1.1(d), United States District Court, Middle District of Florida, a placeholder for a copy of the NeuroInternational Job Description for "Life Skills Coach" as of February 27, 2019, which has been marked as "CONFIDENTIAL," is attached and incorporated herein as **Exhibit "F,"** and an actual copy of the document will be filed in accordance with requirements of the local rule.

13

45.    Following the January 28, 2020, corporate merger, NEURO RESTORATIVE eliminated these four standards for its life skills coaches, who were now known as "life skills trainers," and no longer required its applicants to be emotionally stable of good moral character, or have a passion for working with TBI individuals.

46.    The elimination of these standards furthered widened the available labor pool of inexpensive, inexperienced, and unqualified candidates from which NEURO RESTORATIVE could chose, while it simultaneously increased the risk of abuse, neglect, and harm to NEURO RESTORATIVE's clients, including MATTHEW SMITH.

47.    As of September 2020, one month prior to MATTHEW SMITH'S admission to NEURO RESTORATIVE, the post-merger minimum eligibility requirements for employment as a life skills trainer at NEURO RESTORATIVE had been reduced to the following:

a) A high school diploma or GED equivalent;
b) Six months to one year of experience in the human services field;
c) A valid driver's license from state of residence; and
d) Heavy work. Exerting up to 100 pounds of force occasionally, and/or up to 50 pounds of force frequently, and/or up to 20 pounds of force constantly to move objects.

Pursuant to Local Rule 1.1(d), United States District Court, Middle District of Florida, a placeholder for a copy of the NEURO RESTORATIVE / The Mentor Network's Job Description for "Life Skills Trainer," as of August 31, 2020, which

14

has been marked as "CONFIDENTIAL," is attached and incorporated herein as **Exhibit "G,"** and an actual copy of the document will be filed in accordance with requirements of the local rule.

D. **Even with minimal employment eligibility standards to work as a life skills trainer, Neuro Restorative hired Matthew Smith's abusers without sufficiently vetting them.**

48.    On August 31, 2020, NEURO RESTORATIVE hired Taylor Mitchell as a Life Skills Trainer for the Mango House, the home for the residents of the intensive neurobehavioral rehabilitation program, where MATTHEW SMITH would reside from November 2020 to November 2021.

49.    Taylor Mitchell, then a 21-year-old high school graduate, was hired to work with and supervise traumatically brain injured individuals like MATTHEW SMITH at NEURO RESTORATIVE, despite having little prior work experience of any kind, let alone in an assisted living facility.

50.    Taylor Mitchell also had only one verified reference – his mother, Debra Mitchell.

51.    When asked by NEURO RESTRORATIVE how Taylor Mitchell would meet the expectations and requirements of practicing patience, compassion and empathy when supervising individuals with TBI, Debra Mitchell's response was documented in Taylor Mitchell's personnel file as "have not observed."

52.    Additionally, Debra Mitchell "would not specify" when asked for examples where she had seen her son, Taylor Mitchell, act with patience, compassion and empathy in any other situation or capacity.

53.    NEURO RESTORATIVE knew that Taylor Mitchell was grossly unqualified and unfit to work with TBI clients, like MATTHEW SMTH, but NEURO RESTORATIVE hired him anyway.

54.    On September 15, 2020, NEURO RESTORATIVE hired Paola Servin as a Life Skills Trainer for Mango House.

55.    Paola Servin, then 24-years old with only a high school diploma, had no prior experience working with or supervising individuals with TBI, and her only experience in the health industry was a two-month certified nursing assistant (CNA) course.

56.    Paola Servin's prior work history consisted exclusively of working in restaurants as a hostess and server, working for a cleaning service, working in retail at Bath & Body Works, and working as a secretary/receptionist for a watch and clock service center.

57.    According to Paola Servin's personnel file, none of her three (3) references could be verified by NEURO RESTORATIVE.

58.    The only reference that NEURO RESTORATIVE was able to contact was Paola Servin's manager at Bath & Body Works, Britney [last name unknown],

16

and Britney was unable to verify the reference for Paola Servin due to Bath & Body Works' company policy prohibiting such action.

59.    NEURO RESTORATIVE knew that Paola Servin was grossly unqualified and unfit to work with TBI clients, like MATTHEW SMTH, but NEURO RESTORATIVE hired her anyway.

60.    On March 8, 2021, NEURO RESTORATIVE hired Vanessa Dowling, then 26 years old, as a Life Skills Trainer.

61.    Unlike Taylor Mitchell and Paola Servin, Vanessa Dowling was a college graduate, having earned a bachelor's degree in mass communications in 2018.

62.    However, as with Taylor Mitchell and Paola Servin, Vanessa Dowling had no prior work experience with individuals with TBI.

63.    Vanessa Dowling's prior work experience was limited to being a driver for a car rental agency, a sales associate for various retail companies, and a photographer.

64.    NEURO RESTORATIVE knew that Vanessa Dowling was grossly unqualified and unfit to work with TBI clients, like MATTHEW SMTH, but NEURO RESTORATIVE hired her anyway.

65.    NEURO RESTORATIVE's hiring of Taylor Mitchell, Paola Servin, and Vanessa Dowling on August 31, 2020, September 15, 2020, and March 8, 2021,

respectively, was done in furtherance of its unwritten company policy of forgoing the employment of CBIS in order to reduce payroll costs and maximize profits at the expense of the health, safety, and well-being of NEURO RESTORATIVE's clients/residents, like MATTHEW SMITH.

**E. Neuro Restorative provided insufficient training for Taylor Mitchell, Paola Servin, and Vanessa Dowling, despite knowing that they had no prior experience working with TBI clients.**

66.    By hiring inexpensive, inexperienced, and unqualified individuals, such as Taylor Mitchell, Paola Servin, and Vanessa Dowling, as a matter of unwritten company policy, NEURO RESTORATIVE knew or willfully ignored the fact that these new hires were incapable of following NEURO RESTORATIVE's policies and procedures, employee manual, and training modules that existed for the benefit and protection of TBI clients, like MATTHEW SMITH, unless they received extensive and comprehensive training.

67.    Following their respective hirings, Taylor Mitchell and Paola Servin each initialed and signed a NEURO RESTORATIVE document entitled "Professional Conduct, Workplace Behavior & Boundaries Expectations" (hereinafter "Conduct Agreement").  Pursuant to Local Rule 1.1(d), United States District Court, Middle District of Florida, a placeholder for a copy of the Conduct Agreements signed by Mr. Mitchell and Ms. Servin, which have been marked as "CONFIDENTIAL," are attached and incorporated herein as **Exhibits "H and "I**,"

respectively and actual copies of the documents will be filed in accordance with requirements of the local rule.

68.    A signed Conduct Agreement was not contained within Vanessa Dowling's personnel file, but it is believed that she was also bound by the terms of the Conduct Agreement during all relevant times.

69.    At all relevant times hereto, the Conduct Agreement required Taylor Mitchell, Paola Servin, and Vanessa Dowling to adhere to the following rules when working with NEURO RESTORATIVE's clients, including MATTHEW SMITH, as follows:

> 2. As a result of their disabilities, our clients need and have the right to a quiet, stable, and predictable environment…Staff should always use a calm, relaxed, and level voice tone, especially when confronted with a crisis situation.

> 4. Treat clients with dignity and respect at all times (never mock, tease and/or threaten a client either directly or indirectly) …Provide teaching on appropriate behaviors.

> 7. Use praise and encouragement for positive behaviors that you observe. Clients should never be treated like children even if they display immature behaviors. Instead, use a level and respectful voice tone and model appropriate and mature behavior to help them find a solution to their problem. A large number of our clients will frequently repeat things or make multiple requests and fail to remember that he/she has already made such a request. DO NOT ignore the client, but instead, help orient them and provide appropriate prompts to help them remember their earlier request and what steps you have taken since the initial request to help them fulfill their request.

> 8. Our clients learn much from observing our behaviors and style of interacting with each other. As a result, regardless of our position at NI,

we all serve a role of teachers and therefore need to model appropriate behaviors at all times. *Never curse, threaten, or use profanity of any kind during your shift regardless of whether a client is around or you are with another staff member.* This type of behavior is unprofessional and is strictly prohibited.

*Id*. (emphasis in original).

70.    The Conduct Agreement implicitly required Taylor Mitchell, Paola Servin, and Vanessa Dowling to be emotionally stable of good moral character, or have a passion for working with TBI individuals, but these former express employment eligibility requirements had been eliminated during the application and hiring process.

71.    Consequently, NEURO RESTORATIVE knew or should have known at the time of their hire that Taylor Mitchell, Paola Servin, and Vanessa Dowling were incapable of compliance with the Conduct Agreement and therefore needed extensive and comprehensive training before working with TBI clients to decrease the risk that their inexperience would endanger TBI clients, like MATTHEW SMITH.

72.    One of NEURO RESTORATIVE's training modules, entitled "Proactive Behavior Management," described how the traumatic brain injuries of its clients, which would include MATTHEW SMITH, impacted their behavior:

➢ Our participants * *may-be* * predisposed to unsafe, difficult, and sometimes violent behaviors.

- Property destruction

20

- Self-injury
- Sexual behaviors
- Physical aggression

Pursuant to Local Rule 1.1(d), United States District Court, Middle District of Florida, a placeholder for a copy of the "Proactive Behavior Management training guide," which has been marked as "CONFIDENTIAL," is attached and incorporated herein as **Exhibit "J,"** and actual copies of the documents will be filed in accordance with requirements of the local rule.

73. The "Proactive Behavior Management" also prohibited staff from using punishment and coercion to manage TBI clients like MATTHEW SMITH, stating, in relevant part, as follows:

Emphasis on Punishment to Manage Behavior

➤ Punishment may "teach" in the short term what not to do, but does not "teach" what to do
➤ Results of punishment are often short lasting
➤ Punishment often triggers emotional behaviors worse than the original behavioral problem!

Coercion: The Harmful and Unproductive Attention Based Consequence!

➤ Force:
- Yelling, grabbing, snatching, holding someone, etc. "GET OVER HERE NOW!!"
➤ Taking away privileges in a reactionary manner
- "That's it! I'm tired of this! Turn off that video game and go to bed now!!"

Results of the "Coercion Trap"

➤ Leads to reliance upon punishment to control change and behavior

➢ Leads to relationship based on resentment, retaliation, revenge, & get even behaviors, defiance & opposition!
➢ Participants learn how to be coercive

Coercive Behavior

- IS ABUSIVE
- A violation of the TMN Zero Tolerance Policy
- A violation of Participant Rights
- A violation of the Code of Conduct
- Unprofessional
- Will result in your termination

Proactive Behavior Management

➢ Key Takeaways
   - Coercive behavior is abusive and prohibited
   - We respond to problem behavior by creating a Positive Learning Environment.

*Id.*

74.    NEURO RESTORATIVE also had a training module entitled

"Prevention of Abuse and Neglect Staff Training" that defined the terms "abuse,"

"emotional abuse," and "neglect" as follows:

Abuse: Is harm or threatened harm to a child or vulnerable adult's health or welfare caused by another person; infliction of injury, unreasonable confinement, intimidation, or cruel punishment that causes or is likely to cause physical harm or pain or mental anguish; sexual abuse or sexual exploitation; or the intentional, knowing or reckless "phase" includes acts of omission deprivation of essential needs (sic).

Emotional Abuse: Speaking to an individual in ways that cause emotional pain and distress. Intimidation or threats, humiliation, and ridicule. Also, non-verbal such as eliciting fear, isolating and ignoring the person. Ignoring is not considered emotional abuse when associated with a monitored and written behavior plan.

Neglect: is threat to a child or vulnerable adult's health or welfare by physical or mental injury or impairment, deprivation of essential needs [or] lack of protection from these.

Self-Neglect/Self Abuse refers to persons who do not have the capacity to care for themselves due to their physical or mental impairment. This does not include persons who have the capacity but have chosen an unsafe lifestyle (sic).

Neglect may be the result of lack of attention or awareness. This may include a lack of attention to dietary restrictions or required levels of supervision. Neglect is a failure to provide the necessary level of care - regardless of intent of the care giver (example – being on cell phone rather than attending to participant, staff leaving person on commode for longer than needed due to eating lunch or taking a break.

Indicators of Neglect

❖ Residents suffer from neglect when they are left with staff who fail to care for them appropriately.
❖ A resident fell several days ago. Her ankle is swollen & bruised, & she complains of pain when walking. The resident's doctor or family were not notified of the fall immediately. X-rays taken several days after the fact reveal a fracture.

Pursuant to Local Rule 1.1(d), United States District Court, Middle District of Florida, a placeholder for a copy of the "Prevention of Abuse and Neglect Staff Training," which has been marked as "CONFIDENTIAL," is attached and incorporated herein as **<u>Exhibit "K</u>**," and actual copies of the documents will be filed in accordance with requirements of the local rule.

75.     According to their respective personnel files, Taylor Mitchell and Paola Servin each received only one (1) hour of documented training on "Traumatic Brain

Injury Training" during the entirety of their employment at NEURO RESTORATIVE. Pursuant to Local Rule 1.1(d), United States District Court, Middle District of Florida, a placeholder for copies of Mr. Mitchell's and Ms. Servin's Certificates of Completion of this training module, which have been marked as "CONFIDENTIAL," are attached and incorporated herein as **Exhibit "L" and** **"M**," respectively, and actual copies of the documents will be filed in accordance with requirements of the local rule.

76.    According to their respective personnel files, Taylor Mitchell and Paola Servin each received only one (1) hour of documented training on "Residents Rights, Abuse, Neglect, and Exploitation" during the entirety of their employment at NEURO RESTORATIVE. Pursuant to Local Rule 1.1(d), United States District Court, Middle District of Florida, a placeholder for copies of Mr. Mitchell's and Ms. Servin's Certificates of Completion of this training module, which have been marked as "CONFIDENTIAL," are attached and incorporated herein as **Exhibit "N" and** **"O,**" respectively, and actual copies of the documents will be filed in accordance with requirements of the local rule.

77.    According to their respective personnel files, Taylor Mitchell and Paola Servin each received only three hours of documented training on "ADL's and Behavioral Needs" during the entirety of their employment at NEURO RESTORATIVE. Pursuant to Local Rule 1.1(d), United States District Court,

Middle District of Florida, a placeholder for copies of Mr. Mitchell's and Ms. Servin's Certificates of Completion of this training module, which have been marked as "CONFIDENTIAL," are attached and incorporated herein as **Exhibit "P" and "Q,"** respectively, and actual copies of the documents will be filed in accordance with requirements of the local rule.

78.     The ADL's and Behavioral Needs training module addressed numerous important topics, such as Behavioral Prevention and Intervention, Communication, Grooming, Safety, Client Choices, Mealtime, Dental Hygiene, Transfers, Wheelchair, and Ambulating with a Gait Belt, in only three (3) hours. *Id*.

79.     Additionally, the Employee Orientation Competency evaluations of both Taylor Mitchell and Paola Servin show that NEURO RESTORATIVE had determined that both were competent in the topics of "Professional Behaviors" and "Recognizing and Reporting Abuse, Neglect, & Exploitation" without being tested, like they had been to demonstrate competency in other topics.  Pursuant to Local Rule 1.1(d), United States District Court, Middle District of Florida, a placeholder for copies of Mr. Mitchell's and Ms. Servin's Employee Orientation Competencies, which have been marked as "CONFIDENTIAL," are attached and incorporated herein as **Exhibit "R" and "S**," respectively, and actual copies of the documents will be filed in accordance with requirements of the local rule.

80.    According to Vanessa Dowling's personnel file, she appears to have received even less training on these modules than Taylor Mitchell and Paola Servin, as there are no Certificates of Completion for these modules in her personnel file.

81.    At all times material hereto, neither Taylor Mitchell, Paola Servin, Vanessa Dowling, nor any other Life Skills Trainer had completed or passed NEURO RESTORATIVE's "Gait Belt Competency Checklist," which required evaluation and determination of the employee's competency by a licensed nurse or physical therapist.

82.    In furtherance of its unwritten corporate policy to forgo the hiring of certified brain injury specialists, who are highly trained and qualified by virtue of their brain injury certification, NEURO RESTORATIVE decided not to properly and sufficiently train Taylor Mitchell, Paola Servin, or Vanessa Dowling to work safely with TBI clients, like MATTHEW SMITH.

83.    The decision to forego proper and sufficient training of these new hires was unreasonably motivated by reducing NEURO RESTORATIVE's overhead because such training would have been expensive, time consuming, and likely futile, given Mr. Mitchell's, Ms. Servin's and Ms. Dowling's predisposition for unfitness for the job as Life Skills Trainers.

84. At all relevant times hereto, NEURO RESTORATIVE failed to provide proper and sufficient training to Taylor Mitchell, Paola Servin, and Vanessa Dowling because they were easily replaceable and therefore expendable.

85. At all relevant times hereto, NEURO RESTORATIVE took the position that it was less expensive to simply terminate Taylor Mitchell, Paola Servin, and Vanessa Dowling, and similarly situated employees, should any of them violate NEURO RESTORATIVE's policies, procedures, and rules, and replace them with similarly inexperienced and unqualified employees.

86. Thus, NEURO RESTORATIVE's unwritten hiring policy created a dangerous revolving door of inexpensive, inexperienced, and unqualified employees with no prior experience who jeopardized the health, safety, and well-being of TBI clients, like MATTHEW SMITH, because no one was receiving the proper and adequate training necessary to safely supervise and manage such clients, including MATTHEW SMITH.

**E. Matthew Smith represented a valued "cash cow" for Neuro Restorative.**

87. Pursuant to the VCA and at times material hereto, NEURO RESTORATIVE charged the VA $1,007.00 per day to provide neurobehavioral rehabilitative services for MATTHEW SMITH.

88.    Pursuant to the VCA and at times material hereto, the VA paid NEURO RESTORATIVE $1,007.00 per day for providing MATTHEW SMITH with neurobehavioral rehabilitative services.

89.    At all times material hereto, the VA paid 100% of NEURO RESTORATIVE'S monthly invoice, and for some months, paid approximately 200% of NEURO RESTORATIVE's bill.

90.    However, NEURO RESTORATIVE would only receive payment of $1,007.00 per day from the VA if MATTHEW SMITH had received services from NEURO RESTORATIVE for that day.

91.    NEURO RESTORATIVE would not receive payment relative to MATTHEW SMITH's residency at NEURO RESTORATIVE if, for example, MATTHEW SMITH was absent from the facility due to an inpatient hospitalization.

92.    According to the VA's Explanation of Benefits forms, the VA paid NEURO RESTORATIVE the following amounts for MATTHEW SMITH's residential neurobehavioral services at NEURO RESTORATIVE:

| Date of services | Amount billed | Amount paid |
|---|---|---|
| 10/2/20 to 10/31/20 | $30,210.00 | $67,980.00 |
| 11/1/20 to 11/30/20 | $30,210.00 | $67,980.00 |
| 12/1/20 to 12/31/20 | $31,217.00 | $70,246.00 |

| | | |
|---|---|---|
| 1/1/21 to 1/31/21 | Unknown but believed to be $31,217.00 | Unknown but believed to be $31,217.00 |
| 2/1/21 to 2/28/21 | $28,196.00 | $28,196.00 |
| 3/1/21 to 3/31/21 | $31,217.00 | $31,217.00 |
| 4/1/21 to 4/30/21 | $30,210.00 | $30,210.00 |
| 5/1/21 to 5/31/21 | $31,217.00 | $31,217.00 |
| 6/1/21 to 6/30/21 | $30,210.00 | $30,210.00 |
| 7/1/21 to 7/31/21 | $31,217.00 | $31,217.00 |
| 8/1/21 to 8/31/21 | $31,217.00 | $31,217.00 |
| 9/1/21 to 9/13/21 | $13,091.00 | $13,091.00 |
| 9/17/21 to 9/30/21 | $14,098.00 Total for Sept. 2021: $27,189.00 | $14,098.00 Total for Sept. 2021: $27,189.00 |
| 10/1/21 to 10/31/21 | $31,217.00 | $31,217.00 |
| 11/1/21 to 11/30/21 | $30,210.00 | $30,210.00 |
| 12/1/21 to 12/31/21 | $31,217.00 | $31,217.00 |
| 1/1/22 to 1/28/22 | $28,196.00 | $28,196.00 |

| 1/31/22 to 1/31/22 | $1,007.00 | $1,007.00 |
| | Total for Jan. 2022: | Total for Jan. 2022: |
| | $29.203.00 | $29,203.00 |
| 2/1/22 to 2/28/22 | Unknown but believed to be $28,196.00 | Unknown but believed to be $28,196.00 |
| 3/1/22 to 3/25/22 | $24,168.00 | $20,140.00* (pending approval of payment for 3/22/22 to 3/25/22 |

93.    The VA paid NEURO RESTORATIVE at total of least $566,712.00 for residential neurobehavioral rehabilitative services it provided to MATTHEW SMITH. Copies of the VA's Explanation of Benefits are attached and incorporated herein as composite **Exhibit "T**."

94.    Additionally, NEURO RESTORATIVE charged MATTHEW SMITH himself $30.00 per day for room and board. A copy of NEURO RESTORATIVE's invoices are attached and incorporated herein as composite **Exhibit "U**."

95.    At all times material hereto, MATTHEW SMITH represented a consistent, steady, and guaranteed source of income for NEURO RESTORATIVE by virtue of the VCA and monthly accounts receivables totaling approximately $30,000.00.

F. **Prior to the incident of MATTHEW SMITH's abuse on May 16, 2021, Neuro Restorative had actual or constructive knowledge that it could no longer safely meet MATTHEW SMITH's needs or, alternatively, Neuro Restorative's statewide director, Dr. Parbhoo, was willfully ignorant of same.**

96.    From the time of his admission to NEURO RESTORATIVE on October 2, 2020, to his discharge on March 22, 2022, MATTHEW SMITH required one-on-one (1:1) supervision at NEURO RESTORATIVE in nearly all activities of daily living due to his TBI.

97.    From the time of his admission to NEURO RESTORATIVE on October 2, 2020, to his discharge on March 22, 2022, MATTHEW SMITH required supervision and assistance from the NEURO RESTORATIVE's staff to remain safe and free from harm, abuse, and preventable injury.

98.    In late November 2020, MATTHEW SMITH moved into Mango House, where he would receive intensive neurobehavioral rehabilitation and reside until late November 2021.

99.    To maximize MATTHEW SMITH's neurobehavioral rehabilitation and to assist NEURO RESTORATIVE's staff in managing him, Matthew Sabo, MS, a board-certified behavior analyst, prepared a Behavior Intervention Plan for MATTHEW SMITH on November 24, 2020. A redacted copy of the Behavior Intervention Plan is attached and incorporated herein as **Exhibit "V**."

100. The Behavior Intervention Plan documented that MATTHEW SMITH both strategies for dealing with MATTHEW SMITH's impulsivity and physical aggression and the things that had triggered his impulsive and aggressive behavior, which included prompting by NEURO RESTORATIVE's staff.

101. MATTHEW SMITH's behavioral triggers were largely related to his activities of daily living, where he wanted to be independent and not supervised by staff, and included, in relevant part:

- Delayed or denied access to preferred items or activities;

- Staff assisting him to walk by holding gait-belt;

- Staff prompting him to wear gait-belt;

- When staff provide feedback on inappropriate behaviors;

- Not receiving the desired message from his mother; and

- Being unable to reach his mother.

102. One of MATTHEW SMITH's preferred activities was walking, whether it was around Mango House or on the treadmill.

103. One of MATTHEW SMITH's preferred items was his cell phone on which he listened to music.

104. Because MATTHEW SMITH was as passionate for walking as he was obstinate in resisting help from NEURO RESTORATIVE staff, MATTHEW SMITH had numerous falls.

105.   There were repeated documented instances in MATTHEW SMITH's chart from NEURO RESTORATIVE of MATTHEW SMITH having sustained a witnessed or unwitnessed fall coupled with an admonishment of staff to follow the fall risk protocols for MATTHEW SMITH's health and safety.

106.   During MATTHEW SMITH'S approximate 18-month residency at NEURO RESTORATIVE, there were over one hundred (100) NEURO RESTORATIVE incident reports prepared with respect to incidents involving MATTHEW SMITH.

107.   It is not known what is documented in those voluminous NEURO RESTORATIVE incident reports because they have been withheld in discovery as privileged.

108.   On February 27, 2021, MATTHEW SMITH slipped and fell in the shower at Mango House and sustained a displaced fracture to his left hand that required an open reduction internal fixation procedure to repair.

109.   Since his admission to NEURO RESTORATIVE approximately five (5) months earlier, MATTHEW SMITH had suffered numerous falls, some of which required stitches and other forms of medical attention.

110.   As of February 27, 2021, NEURO RESTORATIVE had prepared forty-five (45) incident reports relating to incidents involving MATTHEW SMITH.

111.   At the time of MATTHEW SMITH's fall on February 27, 2021, Tahar Giardiello was serving as MATTHEW SMITH's 1:1 caretaker / life skills trainer.

112.   It is not known what Tahar Giardiello was doing at the time of the fall or why it happened.

113.   After the fall, neither Tahar Giardiello nor anyone else at NEURO RESTORATIVE timely arranged for MATTHEW SMITH to receive any medical attention for the displaced fracture in his left hand.

114.   No one from NEURO RESTORATIVE timely informed Plaintiff, Shelene Smith, that MATTHEW SMITH had fallen in the shower.

115.   MATTHEW SMITH did not receive medical attention for his left-hand fracture until one week later on March 5, 2021, despite having remained in NEURO RESTORATIVE's exclusive custody, care, and control.

116.   On March 5, 2021, MATTHEW SMITH underwent an x-ray of his left hand, which revealed the displaced fracture, and he underwent surgery on March 12, 2021.

117.   Upon learning of MATTHEW SMITH's fractured left hand, Plaintiff was understandably upset, not only because her son had been injured under NEURO RESTORATIVE's exclusive care but also because she had not been timely informed about it.

118.   At some point in March 2021, Dr. Parbhoo, now the statewide director of NEURO RESTORATIVE, spoke with Plaintiff, Shelene Smith, about the February 27, 2021, fall, apologized for what had happened, and assured her that MATTHEW SMITH would only be assigned the very best care givers/life skill trainers going forward so nothing like this would happen again.

119.   At the time, Plaintiff, Shelene Smith, believed Dr. Parbhoo and trusted that his promises regarding MATTHEW SMITH's care would result in a safe environment for him to continue receiving neurobehavioral rehabilitation services.

120.   However, MATTHEW SMITH continued having falls, which jeopardized the surgical recovery to his left hand.

121.   On March 17, 2021, NEURO RESTORATIVE imposed severe restrictions on MATTHEW SMITH's ability to walk around Mango Place and essentially required him to be wheelchair-bound, except for the occasional scheduled use of a treadmill under supervision. A screenshot of Kristine Vallrugo, M.D.'s note documenting the restriction is reproduced below:



122.    As of March 17, 2021, Dr. Parbhoo was serving as the statewide director for NEURO RESTORATIVE and had ultimately authority regarding patient transfers and discharges.

123.    As of March 17, 2021, Dr. Parbhoo knew or should have known that NEURO RESTORATIVE could no longer safely and reasonably provide for MATTHEW SMITH's rehabilitation needs.

124.    As of March 17, 2021, Dr. Parbhoo knew or should have known that MATTHEW SMITH needed to walk in order to avoid functional decline and to promote positive behavior, as it was well-known that walking was one of MATTHEW SMITH's preferred, if not favorite, activities.

125.    As of March 17, 2021, Dr. Parbhoo also knew or should have known that NEURO RESTORATIVE's staff could not safely handle or supervise MATTHEW SMITH, which exposed MATTHEW SMITH to a substantial threat of serious physical harm.

126.    As of March 17, 2021, Dr. Parbhoo knew or should have known that MATTHEW SMITH's continued residence at Mango House presented a substantial probability that MATTHEW SMITH would suffer serious physical harm if he was allowed to remain at NEURO RESTORATIVE.

127.    Rather than recommend that MATTHEW SMITH be discharged or transferred to another facility that could provide for his needs, Dr. Parbhoo

disregarded both MATTHEW SMITH'S needs and the terms of the MATTHEW SMITH's Resident Contract (**Exhibit "E"**) that governed residency criteria and required that such action be taken "at whatever point the facility could no longer meet the Client needs."

128.   Dr. Parbhoo would not even consider discharging MATTHEW SMITH from NEURO RESTORATIVE or transferring him to another facility because the VA was paying NEURO RESTORATIVE upwards of $31,000.00 per month every month for MATTHEW SMITH's rehabilitation and care at NEURO RESTORATIVE.

129.   Alternatively, as of March 17, 2021, and at all times material hereto, Dr. Parbhoo, as NEURO RESTORATIVE's statewide director, remained willfully ignorant as to MATTHEW SMITH's rehabilitation prognosis, abilities and needs to avoid having to consider discharging MATTHEW SMITH from NEURO RESTORATIVE or transferring him to another facility.

## G. Matthew Smith's physical and emotional abuse at the hands of Neuro Restorative's staff on May 16, 2021.

130.   By April and May 2021, and as the direct result of the change of his plan of care regarding ambulation, MATTHEW SMITH was experiencing significant back pain from having to sit for prolonged periods of time in his wheelchair, which was old and did not offer much support.

131.   MATTHEW SMITH did not get a new wheelchair until August 2021, and when he finally received one, the new wheelchair improved MATTHEW SMITH's mood because he was "in less physical pain while sitting in his new wheelchair," according to the August 2021 monthly treatment note of his mental health counselor, Lee Schlanger.

132.   Additionally, by April and May 2021, MATTHEW SMITH had grown increasingly frustrated whenever he wanted to walk but was told by NEURO RESTORATIVE staff that he could not, which led to increased emotional outbursts because he felt like he was being treated like a child.

133.   MATTHEW SMITH's growing frustrations and emotional outbursts were further exacerbated by NEURO RESTORATIVE's novice staff which had not been properly trained to address them or were categorically unfit to deal with them.

134.   NEURO RESTORATIVE's staff either ignored or were incapable of following Matthew Sabo's Behavior Intervention Plan (**Exhibit "V"**) of November 24, 2020, to safely and appropriately manage MATTHEW SMITH's behavioral issues.

135.   Prior to May 16, 2021, NEURO RESTORATIVE's employee and life skills trainer, Taylor Mitchell, had previously been assigned to serve as MATTHEW SMITH'S caregiver at Mango Place.

136. However, based upon information and belief, Taylor Mitchell demonstrated hostility and/or inattention toward MATTHEW SMITH during these shifts that NEURO RESTORATIVE had prohibited Taylor Mitchell from serving as MATTHEW SMITH's caregiver at Mango House going forward.

137. Based upon information and belief from statements made by Paola Servin, Mango Place had an inadequate number of staff on May 16, 2021, in violation of the staffing ratios required by Florida law.

138. Consequently, for his scheduled shift at NEURO RESTORATIVE on May 16, 2021, Taylor Mitchell was assigned to care for MATTHEW SMITH as his 1:1 caregiver / life skills trainer.

139. At some point on or about May 16, 2021, Taylor Mitchell, while assigned to MATTHEW SMITH as his 1:1 life skills trainer, used excessive force and tied MATTHEW SMITH to his wheelchair with a gait belt.

140. It is believed that MATTHEW SMITH had been frustrated because he had wanted to walk but was not permitted by staff to do so, which precipitated the improper restraint.

141. As a result of the improper restraint, MATTHEW SMITH could not move, which caused him significant physical pain and emotional distress.

142.  According to the statements of Mango Place resident, R.C., who witnessed the abuse, Taylor Mitchell mocked and taunted MATTHEW SMITH while MATTHEW SMITH was restrained and confined to his wheelchair.

143.  To facilitate the improper restraint, NEURO RESTORATIVE's employees, Paola Servin and Vanessa Dowling, held MATTHEW SMITH's arms down so that Taylor Mitchell could restrain MATTHEW SMITH to his wheelchair with his gait belt.

144.  According to the statements Paola Servin, the supervisor for Mango House was absent from the house at the time of the abuse because the supervisor had been called away to another NEURO RESTORATIVE location.

145.  At the time of MATTHEW SMITH's improper restraint, there was no one at Mango House to supervise Taylor Mitchell, Paolo Servin and Vanessa Dowling or to protect MATTHEW SMITH from abuse.

146.  Additionally, the improper restraint caused MATTHEW SMITH to experience significant back pain from being forcibly tied to his old, unforgiving wheelchair, and the physical force, restraint, and verbal taunts exacerbated his post-traumatic stress disorder from having served in Iraq.

147.  A NEURO RESTORATIVE licensed practical nurse, Debra Schaeffer, examined MATTHEW SMITH after the improper restraint incident and documented in a nursing note on May 16, 2021, in relevant part, that:

> Client had several scratches to left neck area. I did ask how it occurred and he would start to talk and then change the subject on me. When I changed it back to the scratches, he changed the subject.

148.  Based upon information and belief, NEURO RESTORATIVE had not properly trained Debra Schaeffer, LPN, to look for signs of abuse, including the reluctance of abuse victim to discuss it.

149.  Based upon information and belief, Debra Schaeffer, LPN, did not know about the reporting of suspected abuse, which was another consequence of NEURO RESTORATIVE's insufficient training.

150.  For reasons which are not yet known, Plaintiff, Shelene Smith, was not immediately told about the abuse and only learned of it later through a third-party.

151.  Plaintiff, Shelene Smith, first learned that MATTHEW SMITH had bruising on his neck in a phone call from Randy Denzel Lambert, who was MATTHEW SMITH's Community Care Specialist from the Wounded Warrior Project, who had observed the bruising during a community outing.

152.  Taylor Mitchell, Paola Servin, and Vanessa Dowling were each terminated from NEURO RESTORATIVE based on the video recording of the incident. Copies of the respective Termination Notices of Taylor Mitchell, Paola Servin, and Vanessa Dowling are attached hereto as **Composite Exhibit "W"**."

153.  The Termination Notices identify their respective job titles as "Direct Support Professionals."

154.   The Termination Notices specifically document that each of the three employees engaged in behavior and conduct that is not consistent with training or expectations for managing behavior incidents and were therefore being terminated.

155.   Absent a court order granting Plaintiff's motion to compel [D.E. 24], NEURO RESTORATIVE intends to withhold production of the video depicting the May 16, 2021, incident of abuse until after its counsel deposes Plaintiff, Shelene Smith, and MATTHEW SMITH, which are tentatively scheduled on January 5, 2024.

### H. Other occasions where Matthew Smith was subjected to abuse

156.   At all times material hereto, MATTHEW SMITH's cell phone was a preferred, if not his favorite, item.

157.   However, MATTHEW SMITH routinely had his cell phone taken away by NEURO RESTORATIVE staff, for reasons which he did not and could not understand.

158.   NEURO RESTORATIVE's conduct in taking away MATTHEW SMITH's cell phone, for which documentation in MATTHEW SMITH's chart is replete, was an additional form of emotional abuse that violated NEURO RESTORATIVE's zero tolerance of coercion.   **See Exhibit "J**."

159.   Lee Schlanger, MATTHEW SMITH's mental health counselor who contracted with NEURO RESTORATIVE, documented how NEURO

RESTORATIVE's routine confiscation of MATTHEW SMITH's phone as a consequence of his misbehavior was making him feel in his July 2021 monthly report as follows:

> Mr. Smith continued to call his mother many times per day, and as such his cell phone continues to be taken away from him. This has caused a serious disturbance for Mr. Smith who reported feelings (sic) angry and diminished by this consequence. Unfortunately, Mr. Smith does not seem to possess the mental acuity at this time to understand the reasoning for his cell phone being removed on a daily basis. This may be due to the nature of his TBI.

160. In August 2021, NEURO RESTORATIVE imposed a protocol whereby MATTHEW SMITH could earn the use of his cell phone from 12:00pm to 8:00 pm by demonstrating non-threatening behaviors for at least 24 hours; if MATTHEW SMITH could display safe and appropriate behaviors for 7 days or longer, he would be eligible to earn the cell phone from 8:00 am to 8:00 pm.

161. This protocol was unreasonable and directly contradicted Matthew Sabo's Behavior Intervention Plan for MATTHEW SMITH and NEURO RESTORATIVE's own policies, procedures, and training modules.

162. Based upon information and belief, the coercive behavior of NEURO RESTORATIVE's employees and staff, including but not limited to Tracy Waller, relative to the confiscation of MATTHEW SMITH's cellphone was continuous from July 2021 to his discharge from NEURO RESTORATIVE on March 25, 2022.

163.   Based upon information and belief, there was an incident of physical and emotional abuse after May 16, 2021, where an employee of NEURO RESTORATIVE's wheeled MATTHEW SMITH into his room, took away his phone, and locked him in his room without any explanation or justification.

164.   Based upon information and belief, there was another incident of physical and emotional abuse after May 16, 2021, that was perpetrated by an unknown employee or agent of NEURO RESTORATIVE that occurred when MATTHEW SMITH was thrown to the ground while residing at Lime House in February 2022.

165.   On February 25, 2022, Jaime Barton, LPN noticed abrasions and bruises on MATTHEW SMITH's back measuring 3 inches by 2 inches that appeared new.

166.   Based upon information and belief, these abrasions and bruises are the result of the incident where MATTHEW SMITH was thrown to the ground by a NEURO RESTORATIVE employee from the Lime House, which is where MATTHEW SMITH lived after leaving the Mango House in late November 2021.

167.   There may be additional incidents of abuse, including but not limited to the coercive behavior of NEURO RESTORATIVE's employees and staff, that have not been documented by NEURO RESTORATIVE or which are documented

in NEURO RESTORATIVE's incident reports that are being withheld from production.

## I.  Incidents of Matthew Smith's neglect at Neuro Restorative

168.  In July 2021, MATTHEW SMITH had a fall at NEURO RESTORATIVE as the result of his gait belt becoming unbuckled.

169.  Based upon information and belief, MATTHEW SMITH's 1:1 care giver was not paying proper attention to him at the time of this fall and had failed to properly buckle his gait belt.

170.  On July 17, 2021, MATTHEW SMITH had a fall at NEURORESTORATIVE as the result of insufficient supervision by his caretakers, and he suffered a head injury that required medical treatment at Doctors Hospital of Sarasota.

171.  Based upon information and belief, MATTHEW SMITH's 1:1 care giver was not paying proper attention to him at the time of this fall.

172.  On September 13, 2021, MATTHEW SMITH suffered either an epileptic seizure or pseudo-seizure at Mango House and started seizing.

173.  In response to this apparent seizure, a NEURO RESTORATIVE care giver, believed to be Franz Vasquez, improperly placed MATTHEW SMITH on his back, which caused him to aspirate and required his intubation and admission to the ICU of Sarasota Memorial Hospital.

174. While MATTHEW SMITH was hospitalized for three days, NEURO RESTORATIVE was not paid its bill of $1,007.00 per day by the VA.

175. Other than this three-day period and a subsequent three-day period in January 2022, when MATTHEW SMITH took leave from NEURO RESTORATIVE to grieve the loss of his step-father, NEURO RESTORATIVE was paid $1,007.00 per day every day from October 2, 2020, to March 25, 2022.

176. During MATTHEW SMITH's hospitalization at Sarasota Memorial Hospital or shortly after his discharge, Dr. Parbhoo reassured Plaintiff, Shelene Smith, that NEURO RESTORATIVE was capable of safely and competently providing MATTHEW SMITH with rehabilitative services and in managing and supervising him.

177. On November 24, 2021, MATTHEW SMITH fell face first on the tile at NEURO RESTORATIVE and sustained two cuts to his forehead.

178. Based upon information and belief, MATTHEW SMITH's 1:1 care giver was not paying proper attention to him at the time of this fall.

179. On December 13, 2021, MATTHEW SMITH fell during an outing while in the care of his 1:1 caretaker, Anna Miller, which caused him to land on his left shoulder and suffer a non-displaced coracoid fracture.

180. Based upon information and belief, MATTHEW SMITH's 1:1 care giver was not paying proper attention to him at the time of this fall.

181.   On December 16, 2021, MATTHEW SMITH arrived for physical therapy overseen by Tara Webber, PTA.

182.   Ms. Webber noted that MATTHEW SMITH did not have either his gait belt or cane with him.

183.   Ms. Webber also noted that she discussed the necessity with NEURO RESTORATIVE staff that MATTHEW SMITH have both his gait belt and cane at all times whenever he was walking.

184.   On January 14, 2022, MATTHEW SMITH slipped and fell on urine in the bathroom with his NEURO RESTORATIVE caregiver present, which resulted in his striking his neck on the grab bar behind the toilet.

185.   Based upon information and belief, MATTHEW SMITH's 1:1 care giver was not paying proper attention to him at the time of this fall.

186.   On February 7, 2022, MATTHEW SMITH had a fall where he landed on his ear, causing an abrasion to his ear canal from the ear buds that were in his ear.

187.   Based upon information and belief, MATTHEW SMITH's 1:1 care giver was not paying proper attention to him at the time of this fall.

188.   Additionally, by January 2022, MATTHEW SMITH had not been receiving adequate nutrition at NEURO RESTORATIVE such that Alejandro Ramirez, M.D., his endocrinologist, had diagnosed MATTHEW SMITH with malnourishment.

47

189.   Alternatively, MATTHEW SMITH was not eating the food placed in front of him at this time because of the totality of MATTHEW SMITH's abuse and neglect up to that point.

190.   In response, MATTHEW SMITH's endocrinologist ordered him to receive a higher calorie diet that included supplemental shakes.

191.   However, MATTHEW SMITH lost a total of ten (10) pounds in less than a month and weighed only 157.5 pounds in February 2022.

192.   MATTHEW SMITH previously weighed 180 pounds at NEURO RESTORATIVE as of December 25, 2020.

193.   There may be additional incidents of MATTHEW SMITH's neglect that have not been documented by NEURO RESTORATIVE or which are documented in NEURO RESTORATIVE's incident reports that are being withheld from production.

## COUNT I – CHAPTER 429 DEPRIVATION OF RESIDENT'S RIGHTS CLAIM AGAINST DEFENDANT, NEUROINTERNATIONAL HEALTHCARE, LLC, d/b/a NEURO RESTORATIVE

194.   Plaintiff incorporates by reference all allegations in paragraphs 1 to 193 as if fully alleged herein.

195.   This is a personal injury action for negligence and violation of MATTHEW SMITH'S resident's rights, codified pursuant to *Fla. Stat. §429.28*, in accordance with *Fla. Stat. §429.29*.

196.   At all times material hereto, Taylor Mitchell, Paola Servin, and Vanessa Dowling were employed by NEURO RESTORATIVE and were acting in furtherance of NEURO RESTORATIVE's business interests.

197.   At all times material hereto, all of MATTHEW SMITH's caretakers at NEURO RESTORATIVE were employees or agents of NEURO RESTORATIVE and were acting in furtherance of NEURO RESTORATIVE's business interests.

198.   Defendant, NEURO RESTORATIVE, had assumed a heightened duty of care to MATTHEW SMITH prior to his admission on October 2, 2020, as the result of NEURO RESTORATIVE's representations to Shelene Smith that led to her to believe that her son, MATTHEW SMITH, would be receiving world-class neurobehavioral rehabilitation and care from NEURO RESTORATIVE's most qualified and experienced staff.

199.   Defendant, NEURO RESTORATIVE, had assumed a heightened duty of care to MATTHEW SMITH as of March 2021, as the result of the representations made by Dr. Parbhoo, in his capacity as NEURO RESTORATIVE's statewide director, to Shelene Smith, whereby Dr. Parbhoo assured her that MATTHEW SMITH would only be assigned the very best care givers/life skill trainers following the February 27, 2021, fall in the shower in which he suffered a displaced fracture in his left hand.

200.   At all times material hereto, Defendant, NEURO RESTORATIVE, had a statutory duty to provide MATTHEW SMITH with his rights as an assisted living facility resident as set forth in *Fla. Stat.* §429.28, including, without limitation, the following:

>   (a)   Live in a safe and decent living environment, free from abuse and neglect;
>
>   (b)   Be treated with consideration and respect and with due recognition of personal dignity, individuality, and the need for privacy;
>
>   (c)   Retain and use his or her own clothes and other personal property in his or her immediate living quarters, so as to maintain individuality and personal dignity, except when the facility can demonstrate that such would be unsafe, impractical, or an infringement upon the rights of other residents; and
>
>   (j) Assistance with obtaining access to adequate and appropriate health care. For purposes of this paragraph, the term "adequate and appropriate health care" means the management of medications, assistance in making appointments for health care services, the provision of or arrangement of transportation to health care appointments, and the performance of health care services in accordance with s. 429.255 which are consistent with established and recognized standards within the community.

201.   Defendant, NEURO RESTORATIVE's, duties, as set forth in *Fla. Stat.* §429.28, are nondelegable duties.

202.   Defendant, NEURO RESTORATIVE, also had a statutory nondelegable duty to exercise and provide reasonable care, supervision, and assistance that

MATTHEW SMITH needed while MATTHEW SMITH resided at NEURO RESTORATIVE's assisted living facilities.

203.   Notwithstanding NEURO RESTORATIVE's heightened assumed duties of care and nondelegable statutory duties to safeguard MATTHEW SMITH's rights as a resident of an assisted living facility and to exercise reasonable care, NEURO RESTORATIVE was negligent, violated those rights, deprived MATTHEW SMITH of such rights, and/or infringed upon such rights by way of the following non-exhaustive acts and omissions:

   a. Failing to discharge or transfer MATTHEW SMITH to another facility that could safely meet MATTHEW SMITH's needs;

   b. Failing to prevent MATTHEW SMITH from being physically and emotionally abused by the employees, agents or servants of NEURO RESTORATIVE, including but not limited to, Taylor Mitchell, Paola Servin, and Vanessa Dowling;

   c. Failing to prevent MATTHEW SMITH from being impermissibly physically restrained by being tied to his wheelchair with a gait belt by employees, agents or servants of NEURO RESTORATIVE;

   d. Failing to prevent MATTHEW SMITH from being neglected by the employees, agents or servants of NEURO RESTORATIVE; including but not limited to, Taylor Mitchell, Paola Servin, and Vanessa Dowling;

e.  Failing to treat MATTHEW SMITH courteously, fairly, and with the fullest measure of dignity;

f.  Failing to provide a safe environment for MATTHEW SMITH;

g.  Failing to provide MATTHEW SMITH with timely and proper custodial, medical and nursing care and treatment;

h.  Failing to follow the orders of MATTHEW SMITH's treating healthcare providers for services, care and treatment;

i.  Failing to properly implement, follow or update MATTHEW SMITH's personal service plan(s) and risk assessment(s);

j.  Failing to provide adequate and appropriate evaluation and care by physicians, nursing staff and other staff members;

k.  Failing to properly hire, train and/or supervise the facility's life skills trainers, nurses, and other staff members;

l.  Failing to document or chart changes in the physical and/or mental conditions of MATTHEW SMITH;

m. Failing to timely and appropriately notify MATTHEW SMITH's guardian and power of attorney, SHELENE SMITH, his family, and/or treating healthcare providers regarding changes in MATTHEW SMITH's physical and/or mental condition, including the incidents of his abuse and neglect;

52

n. Failing to timely and appropriately obtain informed consent from MATTHEW SMITH's guardian and power of attorney, SHELENE SMITH, regarding MATTHEW SMITH's medical treatment and care;

o. Failing to have an adequate amount of licensed nursing staff and other staff members present in the facility to provide adequate and appropriate care and supervision to MATTHEW SMITH;

p. Failing to utilize NEURO RESTORATIVE's vast budget and financial resources to properly operate and/or manage the facility, which includes the hiring of certified brain injury specialists and compliance with staffing ratios, to meet the needs of its residents, including MATTHEW SMITH;

q. Failing to follow the facility's policies, procedures, rules and guidelines;

r. Failing to enforce the facility's policies, procedures, rules and guidelines;

s. Using punishment and/or coercion as a tool for managing MATTHEW SMITH's behavior; and

t. Additional acts and/or omissions as revealed in discovery.

204. Alternatively, prior to May 16, 2021, and at all times material hereto, Defendant, NEURO RESTORATIVE, owed a duty to MATTHEW SMITH to hire

competent, qualified and fit caregivers capable of providing him with appropriate care and supervision.

205.   Prior to May 16, 2021, and at all times material hereto, Defendant, NEURO RESTORATIVE, owed a duty to MATTHEW SMITH to terminate, discharge or reassign caregivers who NEURO RESTORATIVE knew or should have known were not fit to serve as a caregivers in the course and scope of their employment with NEURO RESTORATIVE.

206.   Prior to May 16, 2021, NEURO RESTORATIVE knew that Taylor Mitchell, Paola Servin, and Vanessa Dowling were not unfit and/or not competent to serve as life skills trainers at the time of their respective hiring.

207.   Despite knowing that Taylor Mitchell, Paola Servin, and Vanessa Dowling were unfit and/or not competent for the requirements of the life skills trainer position, NEURO RESTORATIVE nevertheless hired them anyway.

208.   NEURO RESTORATIVE's hiring of Taylor Mitchell, Paola Servin and Vanessa Dowling to work with incapacitated and TBI residents like MATTHEW SMITH was unreasonable.

209.   Prior to May 16, 2021, NEURO RESTORATIVE knew that Taylor Mitchell, Paola Servin, and Vanessa Dowling had not been properly trained and lacked the necessary experience to serve as a life skills trainer for TBI clients like MATTHEW SMITH.

210. The failure of NEURO RESTORATIVE's to properly train Taylor Mitchell, Paola Servin and Vanessa Dowling prior to allowing them to work with incapacitated and TBI residents like MATTHEW SMITH was unreasonable.

211. Prior to May 16, 2021, NEURO RESTORATIVE knew that Taylor Mitchell had demonstrated hostility and belligerence toward MATTHEW SMITH from previously being assigned as his 1:1 caregiver such that NEURO RESTORATIVE prohibited Taylor Mitchell from serving as MATTHEW SMITH's 1:1 caregiver going forward.

212. Taylor Mitchell's previous conduct provided NEURO RESTORATIVE with prior actual or constructive knowledge that he was not fit to be a caregiver at MANGO PLACE or otherwise work with incapacitated and TBI residents, such as MATTHEW SMITH, at NEURO RESTORATIVE.

213. NEURO RESTORATIVE failed to take corrective action against Taylor Mitchell, such as terminating him or reassigning him, after acquiring actual or constructive knowledge of his unfitness to serve as a 1:1 caregiver in the course and scope of his employment with NEURO RESTORATIVE.

214. The failure of NEURO RESTORATIVE to take corrective action against MITCHELL and to continue to allow him to serve as a caregiver at NEURO RESTORATIVE and work with incapacitated residents like MATTHEW SMITH was unreasonable.

215. NEURO RESTORATIVE also violated MATTHEW SMITH's statutory residential rights, by and through its employees, agents and servants, by way of the following non-exhaustive list of acts and/or omissions: a) failing to provide proper aid during a seizure; b) failing to provide sufficient food and nutrition so that he would not be malnourished; c) failing to properly supervise him to prevent him from falling; d) using coercion to manage his behaviors.

216. Finally, NEURO RESTORATIVE engaged in grossly negligent conduct relative to MATTHEW SMITH's residency at NEURO RESTORATIVE that was so reckless and wanting in care that it constituted a conscious disregard to the life, safety and rights of MATTHEW SMITH.

217. At all times material hereto, NEURO RESTORATIVE had an unwritten company-wide policy, which itself was grossly negligent, to hire young individuals with high school diplomas and no prior job or life experience working with TBI individuals as support staff known as "life skills coaches," "life skills trainers," or "direct support professionals."

218. At all times material hereto, NEURO RESTORATIVE had an unwritten company-wide policy, which itself was grossly negligent, to forgo the hiring of certified brain injury specialists (CBIS) for purposes of minimizing company expenses and unreasonably maximizing profits.

219.   At all times material hereto, NEURO RESTORATIVE knew that it needed to hire highly qualified and trained CBIS to protect TBI clients, such as MATTHEW SMITH, from the abuse and neglect.

220.   At all times material hereto, NEURO RESTORATIVE refused to pay the heightened pay rates of CBIS to unreasonably increase its corporate profits.

221.   At all times material hereto, NEURO RESTORATIVE, by and through the imposition of this unwritten company policy and as a general business practice, actively and knowingly hired inexpensive, inexperienced, unqualified, and expendable individuals like Taylor Mitchell, Paola Servin, and Vanessa Dowling to provide supervision to TBI clients, like MATTHEW SMITH.

222.   At all times material hereto, NEURO RESTORATIVE, acted upon this unwritten company hiring policy, and, in doing so, demonstrated a clear and conscious disregard for the life, safety and rights of its clients, specifically MATTHEW SMITH, because it recklessly exposed MATTHEW SMITH to the inexpensive, inexperienced, unqualified, and unfit employees that NEURO RESTORATIVE had assigned to supervise and manage MATTHEW SMITH.

223.   At all times material hereto, NEURO RESTORATIVE, by and through the imposition of its unwritten company policy and as a matter of general business practice, actively and knowingly sought inexperienced and unqualified new hires,

like Taylor Mitchell, Paola Servin, and Vanessa Dowling, to satisfy regulatory staffing ratios and maximize its census and capacity at its assisted living facilities.

224.   At all relevant times, the adherence to NEURO RESTORATIVE'S unwritten hiring policy was motivated primarily by unreasonable financial gain.

225.   At all times material hereto, NEURO RESTORATIVE, by and through its managing agent and statewide director, Dr. Parbhoo, knew or remained willfully ignorant to the fact that Taylor Mitchell, Paola Servin, and Vanessa Dowling could not safely or competently supervise or manage MATTHEW SMITH without sufficient training.

226.   At all times material hereto, NEURO RESTORATIVE, by and through its managing agent and statewide director, Dr. Parbhoo, knew that MATTHEW SMITH would be subjected to abuse and neglect with near certainty by its inexperienced and unqualified employees if it did not sufficiently train those employees.

227.   At all times material hereto, NEURO RESTORATIVE withheld the necessary training from Taylor Mitchell, Paola Servin, and Vanessa Dowling or remained willfully ignorant to their need for such training.

228.   At all times material hereto, this conduct was so reckless and wanting in care that it represented a conscious disregard for the life, safety and rights of the persons, specifically MATTHEW SMITH, when these inexperienced, unqualified,

unfit and untrained employees were assigned to MATTHEW SMITH to serve as life skills trainers and "direct support professionals."

229.    At all times material hereto, NEURO RESTORATIVE, by and through the imposition of its unwritten hiring policy and as a general business practice, refused to spend time or money to properly train inexperienced and unqualified new hires, like Taylor Mitchell, Paola Servin, and Vanessa Dowling, in order to minimize corporate expenses and unreasonably maximize corporate profits.

230.    At all times material hereto, NEURO RESTORATIVE, actively and knowingly chose not to provide the necessary training for new inexperienced and unqualified hires, like Taylor Mitchell, Paola Servin, and Vanessa Dowling, because it was cheaper to simply fire them if/when they got caught abusing or neglecting a TBI client, like MATTHEW SMITH, or violating NEURO RESTORATIVE's policies, procedures, or rules.

231.    Additionally, NEURO RESTORATIVE engaged in grossly negligent conduct through its statewide director and managing agent, Dr. Parbhoo.

232.    At all times material hereto, Dr. Parbhoo had ultimately authority to discharge or transfer NEURO RESTORATIVE residents, like MATTHEW SMITH, once it become known that NEURO RESTORATIVE could no longer meet the resident's needs.

233.   At all times material hereto, Dr. Parbhoo created, implemented or revised policies and procedures that applied to and governed the employees and staff of NEURO RESTORATIVE, including hiring, training, and staffing of employees, and was responsible for making policy decisions on behalf of Neuro Restorative.

234.   As of March 16, 2021, Dr. Parbhoo knew or was willfully ignorant to the fact that NEURO RESTORATIVE could no longer safely or competently meet MATTHEW SMITH's needs, which exposed MATTHEW SMITH to a substantial threat of serious physical harm.

235.   As of March 16, 2021, Dr. Parbhoo knew or was willfully ignorant to the fact that NEURO RESTORATIVE could no longer safely provide rehabilitative services to MATTHEW SMITH, which exposed MATTHEW SMITH to a substantial threat of serious physical harm.

236.   As of March 16, 2021, Dr. Parbhoo knew or was willfully ignorant to the fact that NEURO RESTORATIVE could no longer safely supervise or manage MATTHEW SMITH's behavior, which exposed MATTHEW SMITH to a substantial threat of serious physical harm, abuse, and neglect.

237.   As of March 16, 2021, Dr. Parbhoo knew or was willfully ignorant to the fact that NEURO RESTORATIVE could no longer protect MATTHEW SMITH from the threat of abuse or neglect.

238.   As of March 16, 2021, Dr. Parbhoo knew or was willfully ignorant to the fact that, unless NEURO RESTORATIVE discharged MATTHEW SMITH or transferred him to a facility that could safely provide the rehabilitative services and supervision he needed, MATTHEW SMITH would be a victim of abuse or neglect with near certainty.

239.   Dr. Parbhoo knew or should have known that MATTHEW SMITH's continued residence at Mango House presented a substantial probability that MATTHEW SMITH would suffer serious physical harm if he was allowed to remain at NEURO RESTORATIVE.

240.   However, Dr. Parbhoo would not consider discharging MATTHEW SMITH from NEURO RESTORATIVE.

241.    Dr. Parbhoo would not consider transferring MATTHEW SMITH to a facility that was capable of safely meeting his needs.

242.   Dr. Parbhoo did not want to lose NEURO RESTORATIVE's "cash cow," MATTHEW SMITH, because the VA was paying NEURO RESTORATIVE upwards of $31,000.00 per month for MATTHEW SMITH's rehabilitation and care.

243.   Dr. Parbhoo's refusal to consider discharging or transferring MATTHEW SMITH from NEURO RESTORATIVE, or his willful ignorance of the need to discharge or transfer him, was so reckless and wanting in care that it

represented a conscious disregard for the life, safety, or rights of MATTHEW SMITH.

244. At all times material hereto and as of March 17, 2021, Dr. Parbhoo knowingly ratified, condoned or consented to MATTHEW SMITH's on-going abuse and neglect at the hands of NEURO RESTORATIVE's staff because NEURO RESTORATIVE was unreasonably profiting from MATTHEW SMITH's continued residency at its assisted living facilities.

245. Alternatively, at all times material hereto and as of March 17, 2021, Dr. Parbhoo remained willfully ignorant to MATTHEW SMITH's on-going abuse and neglect at the hands of NEURO RESTORATIVE's staff because NEURO RESTORATIVE was unreasonably profiting from MATTHEW SMITH's continued residency at its assisted living facilities.

246. NEURO RESTORATIVE's grossly negligent conduct in refusing to hire qualified individuals with prior experience in managing TBI clients was reckless and caused and contributed to MATTHEW SMITH's injuries and damages.

247. NEURO RESTORATIVE's grossly negligent conduct in refusing to properly train its inexperienced and unqualified caretakers to manage TBI clients like MATTHEW SMITH was reckless and caused and contributed to MATTHEW SMITH's injuries and damages.

248.   NEURO RESTORATIVE's unwillingness to discharge MATTHEW SMITH or transfer him to a facility that could safely provide him with the services and care he required, by and through its managing agent, Dr. Parbhoo, was reckless and represented grossly negligent conduct that caused and contributed to MATTHEW SMITH's injuries and damages.

249.   Alternatively, NEURO RESTORATIVE's willful blindness, by and through its managing agent, Dr. Parbhoo, to MATTHEW SMITH's needs and NEURO RESTORATIVE's inability to safely meet them and protect him from abuse and neglect was grossly negligent conduct that caused and contributed to MATTHEW SMITH's injuries and damages.

250. As a direct and proximate result of Defendant, NEURO RESTORATIVE's, negligent acts, negligent omissions, and gross negligence, as stated above, by and through its employees and agents, MATTHEW SMITH suffered violations, deprivations, and infringements of his statutory rights pursuant to Fla. Stat. §429.28-29, and further suffered and continues to suffer bodily injury, pain and suffering, disability, physical impairment, disfigurement, mental anguish, inconvenience, aggravation of a preexisting condition and/or activation of a latent disease or physical defect, loss of capacity for the enjoyment of life, loss of dignity, discomfort, inconvenience, expense of hospitalization and medical and nursing care and treatment.

WHEREFORE, Plaintiff, SHELENE SMITH, as Guardian for MATTHEW JOSEPH SMITH, an incapacitated person, demands judgment for compensatory and punitive damages against Defendant, NEUROINTERNATIONAL HEALTHCARE, LLC, d/b/a NEURO RESTORATIVE, costs, and interest, and also demands trial by jury of all issues so triable by right.

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via E-Mail to: Nichole M. Koford, Esq. (NKoford@wickersmith.com; GSosa@wickersmith.com; FColilli@wickersmith.com) of Wicker Smith O'Hara McCoy & Ford, P.A., 100 S. Ashley Dr., Suite 1800, Tampa, FL 33602; and Stephanie W. Ritt, Esq. (SWR@ferrentinobrotz.com; CMF@ferrentinobrotz.com) of Ferrentino + Brotz, 4488 W. Boy Scout Boulevard, Suite 400, Tampa, FL 33607 on this 17th day of November, 2023.

LAW OFFICES OF CRAIG
GOLDENFARB, P.A.
*Attorney for Plaintiff*
1641 Worthington Road
Suite 300
West Palm Beach, FL 33409
(561) 697-4440
By:_____
Timothy D. Kenison
FL Bar No.: 742201
Primary Email:
smithmatthew11220195@projects.filevine.com
Secondary Email:
tkenison@800goldlaw.com
Paralegal's Email:
SNewall@800goldlaw.com